**Leona DAVIS, Plaintiff–Appellee,**

**v.**

**Frank HOLLY, et al., Defendants,**

**Timothy B. Moritz, M.D., Barry I. Fireman, PH.D., Calvert A. Walker, George Gintoli, James J. Ungvarsky, Christopher Robey, Donzella Robinson, Robert J. Ivancic, Cherrie N. Miller, Magdi Rizk, Virginia Brauer, Beverly Ekberg, Sheila Dailey, Defendants–Appellants.**

**No. 85–3769.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 6, 1986.

Decided Dec. 30, 1987.

---

David J. Kovach (argued), Asst. Atty. Gen., Cleveland, Ohio, for defendants-appellants.

Joseph J. Marcoguiseppe (argued), Lakewood, Ohio, for plaintiff-appellee.

Before ENGEL, JONES and NELSON, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

This is a civil rights action brought against certain administrators and supervisors of a state mental hospital by a patient who claims that the defendants' failure to perform their jobs in a proper manner led to her being raped by one of the hospital's employees. The plaintiff also complains that the defendants allowed her to inflict numerous injuries on herself. The defendants' alleged misconduct is claimed to have constituted a clear violation of the United States Constitution, to say nothing of the common law of Ohio. The trial court dismissed three of the five counts in the plaintiff's complaint, but declined to recognize a qualified-immunity defense as to the other two counts. The defendants perfected an interlocutory appeal. Believing that the defendants are wholly immune from suit for their alleged violations of the Federal Constitution, we shall reverse the judgment of the district court insofar as it failed to dismiss the complaint in its entirety.

## I

The plaintiff, Ms. Leona Davis, was a patient at the Western Reserve Psychiatric Habilitation Center during much of 1978 and 1979. She filed suit under 42 U.S.C. §§ 1981, 1983, 1985 and 1986 against nu-

merous individuals and governmental entities involved in the operation of the Center. In the first of the counts left standing by the district court Ms. Davis claims that staff members Frank Holly and James Taylor drove her and three other patients off in a Center-owned van and plied them with alcohol. Holly then allegedly took advantage of her intoxication and mental impairment by having sexual intercourse with her. This happened, according to the complaint, on May 24, 1979. On February 3, 1980, Ms. Davis gave birth to a daughter, Marlene Davis.

The second count, added by amendment after the filing of the original complaint, alleges that because of poor hospital management Ms. Davis was able to injure herself in a variety of ways. Thus she took a large quantity of Thorazine away from a nurse and drank it; she drank steel polish; she tried to commit suicide several times; she tried to destroy property, sometimes injuring herself in the process; she jumped out of a second-story window; she paid a fellow patient to beat her with an iron cord; and she ingested a large open safety pin on one or more occasions.

Named as defendants in the original complaint were staff members Holly and Taylor; the Center and its superintendent; Summit County, Ohio, and its Board of County Commissioners; the Ohio Department of Mental Retardation and Developmental Disabilities and its director; the State of Ohio; and unknown "John Doe" defendants "who were responsible for the protection of plaintiff and for the hiring, conduct, and/or retention of Frank Holly and James Taylor or who could have prevented the wrongful acts complained of herein." (Although Holly was named as a defendant, his whereabouts are unknown and he has never been served with process.) In her first amended complaint Ms. Davis added the Summit County Board of Health and Retardation and its individual members as additional defendants.

The various county and state defendants moved for dismissal of the complaint, and Ms. Davis filed briefs in opposition to these motions. Thereafter a second amended complaint was filed adding Ms. Davis' daughter Marlene as a plaintiff and joining as additional defendants fifteen current or former supervisors and administrators of the Center and former members of the Center's patient abuse committee.

In the fullness of time the district court dismissed the county defendants from the case, observing that they had nothing to do with the operation of the Center, a state facility. The State of Ohio, the Ohio Department of Mental Retardation and Developmental Disabilities, and the Center itself were dismissed on sovereign immunity grounds. Because the other "state" defendants were not protected by sovereign immunity insofar as they had been sued in their individual capacities, the court carefully evaluated each claim against those defendants and determined that all claims filed pursuant to 42 U.S.C. §§ 1985 and 1986 should be dismissed. The claims brought pursuant to §§ 1981 and 1983 were allowed to stand only to the extent that violations of the Fourteenth Amendment were alleged; allegations that the individual state defendants had violated Ms. Davis' rights under the Fifth, Eighth, and Thirteenth Amendments were dismissed.

The appellants on this appeal (all remaining defendants except Holly and Taylor) moved for summary judgment. The district court granted the motion as to all claims of the daughter, Marlene Davis, but declined to enter summary judgment as to the due process claims Leona Davis asserted under § 1983.

Ms. Davis subsequently obtained leave to file a third amended complaint setting forth four counts alleging violations of her due process rights. The first such count charged the defendants with "gross negligence and wanton and reckless disregard of the rights" of Ms. Davis in connection with the rape allegedly committed by Holly on May 24, 1979. The second count related to the acts of self-injury, which were characterized as resulting from violations of Ms. Davis' "right to proper care and treatment, safe conditions of confinement, and personal security...." The third count al-

leged that another mental patient on three occasions entered Ms. Davis' room and engaged in sexual relations with her, as a result of which she became pregnant and ultimately had a miscarriage; it was alleged that the defendants were "directly responsible for these incidents because they failed to prevent, report, and investigate these separate occurrences, all to plaintiff's harm." The fourth count alleged that certain of the defendants "violated their duties and institutional policy" by improperly releasing Ms. Davis from the Center. A fifth count asserted that the facts alleged in counts one through four also constituted violations of Ohio common law.

After the filing of the third amended complaint the remaining defendants (the Center officials named in the second amended complaint plus the individual state officials not dismissed earlier) moved for summary judgment on qualified-immunity grounds. In a memorandum opinion and order filed September 12, 1985, the district court dismissed counts three, four, and five. (The court declined, as a discretionary matter, to exercise pendent jurisdiction over the state common law claims asserted in count five because those claims had been pleaded, very late in the day, in language "so vague that the Court has not been put on notice of what violation of State law plaintiff is complaining [of]. . . .") The court refused to dismiss counts one and two, however, holding that the qualified-immunity defense was inapplicable as to them because the facts there alleged, if true, would have constituted violations of "a. clearly established constitutional right of which a reasonable person would have known." The defendants have perfected an interlocutory appeal from the denial of their motion for summary judgment on the first two counts.

## II

■ Because this appeal was taken from the denial of a motion raising the defense of qualified immunity, we have jurisdiction under the rule of *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), as interpreted in *Kennedy v. City of Cleveland,* 797 F.2d 297 (6th Cir.1986), cert. denied, — U.S. —, 107 S.Ct. 1334, 94 L.Ed.2d 185 (1987).

As a preliminary matter it behooves us to determine whether these defendants are being sued for "discretionary" acts as opposed to "ministerial" ones. Only officials "performing discretionary, as opposed to ministerial, functions are entitled to qualified immunity from suit." *People of Three Mile Island v. Nuclear Regulatory Commissioners,* 747 F.2d 139, 143 (3d Cir.1984). The Michigan Supreme Court recently explained the distinction as follows:

" 'Discretionary-decisional' acts are those which involve significant decision-making that entails personal deliberation, decision and judgment. 'Ministerial-operational' acts involve the execution or implementation of a decision and entail only minor decision-making."

*Ross v. Consumers Power Co.,* 420 Mich. 567, 363 N.W.2d 641, 647 (1984). See also *McIntosh v. Weinberger,* 810 F.2d 1411, 1432 (8th Cir.1987), and *Manion v. Michigan Board of Medicine,* 765 F.2d 590, 594 n. 1 (6th Cir.1985).

The trial court has given us this description of the roles played by the various defendants in the case at bar:

"1. *Mr. James Ungvarsky* was a supervisor at the hospital during early 1979. The allegation is that he set up and maintained lax procedures for supervising the clients in the hospital.

2. *Dr. Timothy Moritz* ran the state mental hospital system during the relevant period of time. The claim against Dr. Moritz is rather attenuated and relates to a general laxity at the facility which plaintiffs contend he condoned.

3. *Sheila Dailey* was on the patient abuse committee at the facility but was not present when the Davis case was heard. The claim against Ms. Dailey focuses upon a lax atmosphere created by the committee's conduct.

4. *Calvert Walker* was superintendent of the facility beginning in June 1979. The plaintiffs allege a range of post-right

failures to impose proper controls on the patients and the guards.

5. *Chris Robey* was the project director of cottage 21, the place where plaintiff was held, from June through August 1979. He was also a shift coordinator responsible for hospital aid[es'] conduct at the time of the rape.

6. *Donzella Robinson* was a shift coordinator at the time of the rape and was responsible generally for conditions in cottage 21.

7. *Robert [Ivancic], Dr. Magdi Rizk, Ms. Cherrie N. Miller, Ms. Beverly Ekberg, and Ms. Brauer* served on the patient abuse committee and reviewed plaintiff's complaint. They are also alleged to have contributed to a lax atmosphere at the facility."

In addition, defendant Barry Fireman was Superintendent of the Center before Calvert Walker took over, and defendant George Gintoli, according to his deposition testimony, was a cottage service director in charge of overseeing various programs.

The charges in Ms. Davis' complaint are based primarily upon alleged acts and omissions of the defendants in carrying out their "responsibility [to provide] proper care and treatment, safe conditions of confinement, and personal security." The supervisory responsibilities that the defendants allegedly failed to discharge were inherently discretionary in nature. In contrast to ministerial tasks involving routine functions, the responsibilities of these defendants were "almost inevitably ... influenced by the decisionmaker's experiences, values, and emotions," *Harlow v. Fitzgerald,* 457 U.S. 800, 816, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and thus qualify as "discretionary."

### III

We must determine next whether the alleged gross negligence of the defendant officials in supervising Holly (the supposed rapist) violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. at 2738. An official will " 'not be

held liable in damages under § 1983 unless *the constitutional right he was alleged to have violated* was "clearly established" at the time of the violation.' " *Davis v. Scherer,* 468 U.S. 183, 194, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984) (quoting *Butz v. Economou,* 438 U.S. 478, 498, 98 S.Ct. 2894, 2906–07, 57 L.Ed.2d 895 (1978)) (emphasis added in *Davis* ). Whether the defendants were answerable to Ms. Davis for negligence under state law is immaterial to this inquiry, and it is important to bear in mind that a determination that Ms. Davis had no clear right to sue the defendants under § 1983 for a violation of the United States Constitution does not mean that she could not sue them for negligence under the common law of Ohio. (Whether the district court was correct in dismissing the common law claims asserted in court five of the third amended complaint is a question not now before us, but we note that if Ms. Davis has no federal constitutional claims, she is not entitled to have her state law claims tried in federal court under the doctrine of pendent jurisdiction.)

The alleged sexual assault took place May 24, 1979. The question is whether, at that time, a reasonable person in the defendants' position would have known that a mental patient had a clearly established *constitutional* right to be free from grossly negligent or reckless administrative and/or supervisory practices exposing her to an undue risk of sexual attack.

Appellee cites several mid–1970s court of appeals decisions that suggested a mental patient could bring a civil rights action against supervisory or administrative officials for constitutional defalcations in respect of assaults by others. In *Goodman v. Parwatikar,* 570 F.2d 801, 804 (8th Cir. 1978), the Court of Appeals for the Eighth Circuit stated that a mentally retarded patient

"had a constitutional right to a basically safe and humane living environment. See *Harper v. Cserr,* 544 F.2d 1121 (1st Cir.1976); *New York State Ass'n for Retarded Children, Inc. v. Rockefeller,* 357 F.Supp. 752 (E.D.N.Y.1973). The state has a duty to provide a humane living

environment which includes a duty to protect inmates from assault by fellow inmates and staff, which if callously disregarded may constitute a violation of civil rights.  * * *

"If plaintiff can establish at trial a sufficient helplessness on the part of [the patient] and a deliberate indifference toward [the patient's] serious medical needs, including protection from assault, on the part of those caring for her, then plaintiff will have proved that she was denied her constitutional right to a humane and safe living environment while confined under state authority." (Citations omitted.)

In *Spence v. Staras*, 507 F.2d 554 (7th Cir.1974), the Court of Appeals for the Seventh Circuit considered the case of a "nonverbal" inmate of an Illinois state mental hospital who had been beaten by fellow inmates about twenty times. The complaint alleged that the defendants knew of the beatings and knew that the patient could not call for help or defend himself when attacked. The court held that the complaint stated a cause of action under § 1983, the patient having a right to "be secure in his life and person while confined under state authority.  * * * The defendants, being responsible for the decedent's care and safekeeping, had a duty to protect him from attacks by fellow inmates." *Spence*, 507 F.2d at 557 (citations omitted). The court found the complaint alleged that there was more than an "isolated incident" or mere negligence, and thus stated a claim cognizable under § 1983.[1]

Instructive though the decisions of other circuits may be, more pertinent, for purposes of our inquiry, are those of the Supreme Court and of this circuit. In light of *Puckett v. Cox*, 456 F.2d 233, 235 (6th Cir.1972), we do not believe that hospital personnel in this circuit could have considered the constitutional right claimed by Ms. Davis to have been clearly established in this jurisdiction. *Puckett* acknowledged that "some forms of negligence"[2] could be the basis for § 1983 relief, but held that there must be more than an isolated incident of negligence. In 1978 a district court in the Eastern District of Tennessee relied on *Puckett* in deciding the case of a female mental patient who claimed she was raped by another patient as a result of her placement in a sexually integrated ward that did not have enough supervisory personnel. The court concluded that the plaintiff had only alleged an "isolated incident," and declared that "[w]e do not believe that the allegations in plaintiff's complaint rise to the extreme level of neglect or deliberate inaction present in [cases which have allowed negligence claims under § 1983]." *Butler v. Commissioner of Mental Health*, 463 F.Supp. 806, 809–10 (E.D.Tenn. 1978).

In the case at bar there is no allegation that other staff members engaged in conduct comparable to Holly's or that any patient other than Ms. Davis was victimized by Holly. As soon as Ms. Davis complained about Holly to another member of the hospital staff, as she did when Holly made subsequent advances toward her, an investigation was undertaken to determine what had actually happened. The investigators concluded that there was insufficient evidence to support the allegations of Ms. Davis (who was known to have made up wild stories in the past), but whether that conclusion was right or wrong, it is clear that the Center's personnel did not stand idly by once alerted to the possibility of a problem with Holly.

Ms. Davis says that patients were often taken for van rides without proper authori-

---

**1.** Although most of the other cases cited by Ms. Davis were decided after 1978 and 1979, there are several earlier citations that do not merit much discussion. *Johnson v. Glick*, 481 F.2d 1028 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973), and *Santiago v. City of Philadelphia*, 435 F.Supp. 136 (E.D.Pa. 1977), both involved penal institutions and could not serve clearly to establish rights of patients housed in state hospitals. *Jones v. Hil-*

*debrant*, 432 U.S. 183, 97 S.Ct. 2283, 53 L.Ed.2d 209 (1977), and *Gregory v. Thompson*, 500 F.2d 59 (9th Cir.1974), do not involve incidents within any sort of institution.

**2.** But see *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986); *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

zation, and that the van ride of May 24, 1979, was merely one such occasion. But although unauthorized use of the van may not have been uncommon, it is not a violation of van-use regulations upon which count one of Ms. Davis' complaint is based.[3] Count one is based on failure to prevent a rape, and as far as Ms. Davis' counsel was able to indicate in four attempts at pleading this claim, the rape that the defendants failed to prevent was an isolated incident. The defendants' conduct did not amount to a violation of a clearly established constitutional right, whether or not it amounted to a violation of any duty owed Ms. Davis under the common law of Ohio, and count one of the complaint ought to have been dismissed by the district court.

## IV

■ We must next consider whether, during 1978 and 1979, a mental patient had a clearly established *constitutional* right to the exercise of such care by hospital personnel as would prevent volitional self-injury.

Ms. Davis cites *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), for the proposition that a mentally retarded person confined to a state institution has a constitutional right to a safe environment. That *Youngberg* may have established such a right in 1982, however, does not mean that it was clearly established in 1978 and 1979. The portion of *Youngberg* on which Ms. Davis relies, 457 U.S. at 315–16, 102 S.Ct. at 2457–58 does cite two Supreme Court cases decided before Ms. Davis was admitted to the Center, but neither of those cases (*Ingraham v. Wright,* 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977), and *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)) could have put the defendants on notice that Ms. Davis had a constitutional right to be protected from her own self-destructive behavior. *Ingraham* speaks of a right to "personal security," but only in discussing whether corporal punishment may be used on school children. The Court recognized that the students had a "liberty interest" protected by the Fourteenth Amendment, but the Court was focusing on the potential impairment of that interest by the infliction of punishment; it was not addressing the question whether the students had a constitutional right to be protected from themselves. In *Hutto v. Finney,* similarly, the threat to personal safety came from abusive prison guards and from attacks by other inmates, not from self-destructive acts. It was not until after *Youngberg* was decided in 1982 that a person such as Ms. Davis might have been able to assert the existence of a clearly established constitutional right to be protected from self-injury. The Supreme Court itself acknowledged that it was plowing new ground when it stated, in *Youngberg,* that "[w]e consider here *for the first time* the substantive rights of involuntarily committed mentally retarded persons under the Fourteenth Amendment to the Constitution." *Youngberg,* 457 U.S. at 314, 102 S.Ct. at 2457 (emphasis supplied).

Ms. Davis cites only one case decided prior to 1978 that recognized a constitutional right for a mental patient to be protected from her own actions. In *Harper v. Cserr,* 544 F.2d 1121 (1st Cir.1976), the husband of a deceased patient brought a civil rights action against the superintendent of the mental institution where the patient had hanged herself. The plaintiff claimed that the superintendent, knowing of his wife's suicidal propensities, failed to take any

---

**3.** "[O]fficials sued for violations of rights conferred by a statute or regulation, like officials sued for violation of constitutional rights, do not forfeit their immunity by violating some *other* statute or regulation. Rather, these officials become liable for damages only to the extent that there is a clear violation of the statutory rights that give rise to the cause of action for damages. And if a statute or regulation does give rise to a cause of action for damages, clear violation of the statute or regulation forfeits immunity only with respect to damages caused by that violation. In the present case, ... there is no claim that the state regulation itself or the laws that authorized its promulgation create a cause of action for damages or provide the basis for an action brought under § 1983." *Davis v. Scherer,* 468 U.S. 183, 194 n. 12, 104 S.Ct. 3012, 3019 n. 12, 82 L.Ed.2d 139 (1984).

steps to prevent her from taking her own life. The court held that the plaintiff might be able to establish a constitutional violation, but it also acknowledged that "[s]ince the constitutional right of the deceased to be free from harm is by no means certain, and in the present nascent stage of the law could not have been foreseen, the defendant plainly had no reason to know whether or not what he did would be a constitutional violation." *Harper*, 544 F.2d at 1124–25.

Unless the defendants in this case (all of whom are presumably non-lawyers) had a quite extraordinary familiarity with the contents of the Federal Reporter, it is difficult to see how an admittedly novel decision from another circuit could reasonably be expected to have changed the defendants' perception of how the Constitution is understood in this circuit. *Harlow v. Fitzgerald* teaches that if a qualified-immunity defense is to be defeated on the ground that the constitutional violation was obvious, the constitutional rights in question must have been "clearly established" and must have been the sort that a "reasonable person" would have known about. *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. A single idiosyncratic opinion from the court of appeals for another circuit was hardly sufficient to put the defendants on notice of where this circuit or the Supreme Court might come out on the issue in question. *Cf. Hoang Ha v. Schweiker*, 707 F.2d 1104, 1106 (9th Cir.1983). The district court ought to have dismissed both the first and second counts of Ms. Davis' third amended complaint, just as it dismissed the remaining counts.

The judgment of the district court is REVERSED, and the case is REMANDED with instructions to dismiss the remaining counts as to all appellants.[4]

NATHANIEL R. JONES, Circuit Judge, dissenting.

Because I believe that the doctrine of qualified immunity does not insulate these defendants from suit on the charges alleged in Counts One and Two of plaintiff's amended complaint, I respectfully dissent.

The first two counts of plaintiff's complaint basically allege that defendants were grossly negligent and reckless in their administration and supervision of the Center, and as a result allowed plaintiff to be exposed to an undue risk of sexual assault and to repeated incidents of life-threatening self-abuse. Regardless of whether she can succeed at trial, plaintiff's allegations squarely implicate her constitutional liberty interest in personal safety and security. In my mind, this interest was "clearly established" well before 1979 when the events at issue in this case occurred, and accordingly qualified immunity was improperly granted.

In order for a constitutional right to be "clearly established" and thus provide a basis for damages liability under Section 1983, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right." *Anderson v. Creighton*, —— U.S. ——, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). The *Anderson* Court made clear that this does not mean that "the very action in question" must have previously been held unlawful in order for a Section 1983 action to avoid a premature death at the hands of the qualified immunity doctrine. Rather, the right will be considered clearly established, and the law suit will be allowed to proceed, upon the lesser showing that the unlawfulness of the official action was apparent in light of pre-existing law. *Id.*

Applying this standard, I believe that the law requiring protection of the personal security of patients in mental institutions was clearly established in 1979. The Supreme Court set out the contours of this right to personal security in *Ingraham v. Wright*, 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977) and *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), cases decided prior to

---

**4.** This disposition does not affect the case against defendants Frank Holly and James Taylor, of course.

the events at issue here. And in *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), while recognizing for the first time the obligation of the state to provide a minimum level of specialized training for patients in mental institutions, the Court reaffirmed the existence of a well-established due process right to be confined in safe conditions. *Id.* at 315–16, 102 S.Ct. at 2457–58.

Indeed, in a recent case, a panel of the Tenth Circuit held, contrary to the majority's decision in the instant case, that a mental patient's right to personal security was clearly established prior to the Supreme Court's *Youngberg* decision. *See Garrett v. Rader*, 831 F.2d 202, 203–04 (10th Cir.1987). In *Garrett*, a Section 1983 action was brought against administrators of a state institution for retarded children by the mother of a retarded child. The child had died at the school in 1980 while being unreasonably restrained by employees. Plaintiff alleged that the defendant-administrators were liable under Section 1983 for failing to "adequately monitor, supervise, hire, and train, direct-care personnel at the school." *Id.* at 203. The unanimous court in *Garrett* rejected defendants' pretrial motion for summary judgment on the basis of qualified immunity. The court noted that *Youngberg* had "explicitly recognized the due process rights of parties in state institutions which were entitled to protection long before ... 1980," including the right to be confined in safe conditions. *Id.* Then, applying the standard set out in *Anderson, supra*, the court concluded that "at least by the time of the death of [plaintiff's decedent], the law requiring protection of the personal security of inmates and patients in state institutions was clearly established."

I agree with the reasoning of the Tenth Circuit and would deny qualified immunity in this case. Reasonable officials in the positions of these defendants should have known in 1979 that it was unlawful to conduct their duties in so grossly negligent and reckless a manner that the personal safety of a patient was inevitably jeopardized. In my view the unlawfulness was just as apparent with respect to grossly negligent behavior resulting in a rape as it was with such behavior enabling a severely mentally ill patient to commit repeated acts of life-threatening self-abuse.

I also take issue with the majority's conclusion that the first count of plaintiff's complaint cannot be the basis for Section 1983 relief because it alleges nothing more than an "isolated incident" of negligence. In my view there is plenty of evidence to suggest that the defendants were *grossly negligent* and *reckless*—not just negligent—in their administration and supervision. Specifically, the evidence suggests that Mr. Holly, the alleged rapist, was hired by defendants despite the recommendation of an experienced staff member that he was not acceptable for employment at the Center. The evidence also suggests that defendants were unable or unwilling to ensure that the employees under their supervision complied with the rules and regulations of the Center. For instance, maximum security patients, like this plaintiff, were routinely taken off of the hospital's premises without their doctor's permission. And there is abundant evidence to suggest that the staff felt free to ignore the announced procedures with regard to van use authorization. Moreover, the evidence presented concerning the procedures and conduct of the patient abuse committee at least raises an issue of whether that committee's inattention to charges of abuse rose to the level of gross negligence or recklessness.

In short, I believe plaintiff's allegations in Count One, and the evidence presented so far, raises a jury question as to whether defendants' conduct was grossly negligent or reckless, and whether such conduct proximately resulted in the sexual abuse of the plaintiff in violation of her clearly established constitutional right to be confined in safe conditions. Accordingly, I do not believe summary judgment was appropriate.

For all of the foregoing reasons, I would affirm the judgment of the district court.