62 F.3d 1419
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
H. Robert NIELSEN, as Administrator of the Estate of Robert
W. Nielsen, deceased, Joan Nielsen, Jeanne
Nielsen, et al., Plaintiffs-Appellees,
Cross-Appellants,
v.
Thomas CLAYTON, individually and as Mental Health Technician
for the Tinley Park Mental Health Center, Ann J.
Honeysucker, individually and as Charge Nurse for the Tinley
Park Mental Health Center and Mary Barnes, individually and
a as Licensed Practical Nurse for the Tinley Park Mental
Health Center, Defendants-Appellants, Cross-Appellees.
 Nos. 94-1620, 94-1765 and 94-1766.
 United States Court of Appeals, Seventh Circuit.
 Argued April 13, 1995.
Decided July 11, 1995.
 
 Before Posner, Chief Judge, and Eschbach, and Manion, Circuit Judges.
 
 ORDER
 
 1
 Robert Nielsen was involuntarily committed to the Tinley Park Mental Health Center on December 17, 1981. On the evening of December 23, 1981 Thomas Clayton, a Tinley Park employee, placed Nielsen in a locked observation room, where he was found dead the following morning. Nielsen's family filed suit under Sec. 1983 against Clayton and several other Tinley Park employees for deprivation of constitutional rights and conspiracy. The jury returned a verdict in favor of Nielsen's family against all defendants for over $2.7 million. The district court granted judgment notwithstanding the verdict ("JNOV") to two of the defendants. The district court also awarded remittitur, reducing the award to just under $1.2 million.
 
 
 2
 Clayton appeals, claiming that the evidence was insufficient to support a jury verdict that he used a choke-hold on Nielsen. Alternatively, Clayton asserts that he was entitled to qualified immunity because it was not clearly established that using a choke-hold on a mental patient violated that patient's constitutional rights to life and liberty. In addition, Clayton and two other Tinley Park employees appeal the verdict that they conspired to deprive plaintiffs of their right of access to the courts by covering up the facts surrounding Nielsen's death. They also appeal the denial of their motion for JNOV on the access to courts claim. The plaintiffs in turn appeal the district court's grant of JNOV to the other two defendants. And, although they accepted the district court's remittitur, plaintiffs also appeal the district court's reduction of the damage award. We affirm in all respects.
 
 I. Background
 
 3
 Robert Nielsen, who had a history of mental illness, was involuntarily committed to the Tinley Park Mental Health Center (Tinley Park) on December 17, 1981. On December 23, 1981 at approximately 11:00 p.m., Thomas Clayton, a mental health technician at Tinley Park, found Nielsen lying on the hallway floor. Clayton asked Tinley Park nurses Mary Barnes and Ann Honeysucker what should be done with Nielsen. The three decided that Nielsen should be placed in an observation room.
 
 
 4
 Clayton testified at trial that he roused Nielsen, helped him off the floor and led him to an observation room. Other Tinley Park employees also testified that Clayton led Nielsen by the arm into the observation room. A patient at Tinley Park, Carlos Gallardo, however, testified that he saw Clayton dragging Nielsen by the neck, using a choke-hold. The use of a choke-hold violates Tinley Park policy. Choke-holds are also barred as a prohibited restraint in the mental health field.
 
 
 5
 After putting Nielsen in the observation room, Clayton locked the door. The only people with keys to the observation room were Clayton, Barnes and Honeysucker. Of the three, only Barnes went into the observation room that night; no one else was seen entering the observation room. The next morning when Clayton checked on Nielsen, he found him lying face down on the bed, dead. Clayton called Barnes and Honeysucker, and after finding no vital signs, Honeysucker called Dr. Choi, the Tinley Park doctor on call. After examining Nielsen, Dr. Choi pronounced him dead of unknown causes. Choi, however, indicated to the Tinley Park police that Nielsen appeared to have died from cardiac arrest.
 
 
 6
 Later that day, Abdul Basit, the superintendent of Tinley Park, empaneled a three-member committee to investigate Nielsen's death. The committee obtained information from Clayton, Barnes, Honeysucker, another nurse and the medical examiner. Based on its investigation, the committee issued a final report on January 11, 1982, finding that there was no evidence of an accident or injury to Nielsen, and no evidence of negligence or malfeasance on the part of Tinley Park employees. The committee also found that Nielsen had received good treatment and care while at Tinley Park. In addition to Tinley Park's investigation into the cause of Nielsen's death, a medical examiner conducted an autopsy on Nielsen. The medical examiner concluded that Nielsen died from asphyxiation due to unknown causes. The medical examiner, however, also noted that Nielsen had suffered trauma to his neck.
 
 
 7
 Following the release of Tinley Park's committee report and the medical examiner's report on Nielsen's death, Nielsen's parents and siblings, individually and on behalf of Robert's estate ("plaintiffs"), filed suit against Clayton, Honeysucker, Barnes, Basit and Choi.[1] In their complaint, plaintiffs alleged a Section 1983 claim against Clayton, Honeysucker and Barnes asserting that they deprived Nielsen of his constitutional rights of life and liberty. Plaintiffs also alleged a Section 1983 claim against Clayton, Honeysucker, Barnes, Basit and Choi, asserting that these defendants conspired to deprive plaintiffs of their constitutional right of access to the courts by covering up the facts surrounding Nielsen's death.[2]
 
 
 8
 After trial a jury returned a verdict in favor of the plaintiffs and against defendants Barnes, Honeysucker and Clayton on plaintiffs' claim that they deprived Nielsen of his constitutional rights to life and liberty. The jury also found in favor of the plaintiffs and against Clayton, Honeysucker, Barnes, Basit and Choi on plaintiffs' claim that they conspired to deprive plaintiffs of their right of access to the courts. The jury awarded plaintiffs damages of over $2.7 million.
 
 
 9
 Defendants then filed motions for judgment not withstanding the verdict, and a motion for a new trial or a remittitur. The district court granted defendants Barnes and Honeysucker JNOV on plaintiffs' life and liberty claim, and granted defendants Basit and Choi JNOV on plaintiffs' claim that they conspired to deprive plaintiffs of their right of access to courts. The district court also concluded that a new trial on damages would be appropriate, unless the plaintiffs accepted a remittitur of just under $1.2 million. The plaintiffs opted to accept the remittitur.
 
 
 10
 Defendants Clayton, Honeysucker and Barnes appeal. On appeal, Clayton asserts that the evidence was insufficient to support a jury verdict that he deprived Nielsen of his life and liberty by using a choke-hold on him and causing his death. Alternatively, Clayton asserts that he was entitled to qualified immunity because it was not clearly established that using a choke-hold on a mental patient violated that patient's constitutional rights to life and liberty. Clayton, along with Honeysucker and Barnes, also asserts on appeal that the evidence was insufficient to support a jury verdict on plaintiffs' claim that they conspired to deny plaintiffs their right to access the courts.
 
 
 11
 Plaintiffs cross-appealed, contending that the district court erred in granting Basit and Choi JNOV on their claim that the defendants conspired to deny plaintiffs their right of access to the courts. Plaintiffs also contend that the district court erred in requiring plaintiffs to choose between accepting a remittitur or retrying the issue of damages.
 
 II. Analysis
 
 12
 Clayton's first argument on appeal is that the evidence was insufficient to support a jury verdict that he used a choke-hold on Nielsen, much less that the choke-hold caused Nielsen's death. Accordingly, Clayton asserts that he was entitled to JNOV on this claim. We review the district court's denial of a motion for judgment notwithstanding the verdict (currently entitled "judgment as a matter of law") de novo. Futrell v. J.I. Case, 38 F.3d 342, 346 (7th Cir. 1994). "The standard of review is whether the evidence presented, combined with all reasonably inferences that may be drawn from it, sufficiently supports the jury verdict when viewed in the light most favorable to the party winning the verdict." Id. at 346.
 
 
 13
 After reviewing the record, we conclude that, viewing the evidence in the light most favorable to the plaintiffs, there was sufficient evidence to support the jury's finding that Clayton used a choke-hold on Nielsen and that the choke-hold caused Nielsen's death. Specifically, the record contains the testimony of Carlos Gallardo, a patient of Tinley Park, who testified that at approximately 11:00 p.m. on December 23, 1981, he saw Clayton drag Nielsen by the neck, in a choke-hold, while Nielsen was hanging limply without movement. The record also contains evidence that Nielsen had received injuries to his neck, including a hemorrhage, within twenty-four hours prior to his death and that the use of a choke-hold can cause such injuries. Medical evidence in the record also supports the jury's conclusion that Clayton's use of the choke-hold caused Nielsen's death. Specifically, after an autopsy was performed on Nielsen, the medical examiner issued a final death certificate stating that Nielsen's cause of death was asphyxia. Medical experts also testified that a choke-hold can cause asphyxia. Robert Stein of the Cook County Medical Examiner's Office also testified that a choke-hold can cause a person to become unconscious or die.
 
 
 14
 In response, Clayton attacks the credibility of Gallardo, the jury's reliance on Gallardo's testimony in light of the conflicting testimony that Clayton led Nielsen by the arm to the observation room, and the jury's reliance on the medical testimony. We note, however, that "it is uniquely the function of the jury to sift through conflicting evidence, and on appellate review this court will not reweigh evidence as long as there is a reasonable basis on record to support the jury's verdict." Stone v. City of Chicago, 738 F.2d 896, 900 (7th Cir. 1984). Moreover, "[t]he reviewing court 'does not judge the credibility of witnesses."' Futrell, 38 F.3d at 346 (quoting Mathewson v. National Automatic Tool Co., Inc., 807 F.2d 87, 90 (7th Cir. 1986)). That is because the jury is "in a superior position to appraise and weigh the evidence." Wyant v. J.I. Case Co., Inc., 633 F.2d 1254, 1256 (7th Cir. 1980). Accordingly, we reject Clayton's request for this court to judge Gallardo's credibility and weigh his testimony with that of other Tinley Park employees. We also reject his request that we sift through the medical evidence and reassess that testimony.
 
 
 15
 Clayton next asserts that the use of the choke-hold was not a violation of Nielsen's constitutional rights because his actions did not substantially depart from accepted professional practices or amount to conscious indifference or gross negligence. Clayton's argument is framed in terms of the Supreme Court decision of Youngberg v. Romeo, 457 U.S. 307 (1982). In Youngberg, the Supreme Court held that a mental health patient's constitutional rights are violated and liability attaches when it has been shown that the mental health care professional's action constituted "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Id. at 323. Clayton claims that the use of a choke-hold did not constitute such a departure from accepted professional judgment. We disagree.
 
 
 16
 The evidence in this case established that the use of a choke-hold on a patient violated not only Tinley Park's regulations, but is a prohibited restraint device in the mental health profession at large. Specifically, Dr. Alex Spadoni, a member of the committee to revise the Illinois Mental Health Code, testified that a choke-hold is "absolutely not" within the definition of restraint under the Mental Health Code. Another psychiatric expert also stated that "I don't believe a choke-hold is ever within a standard of acceptable care." Based on this testimony, a jury could reasonably conclude that the use of a choke-hold on a non-violent patient constituted a substantial departure from accepted practices.
 
 
 17
 Alternatively, Clayton asserts that even if he used a choke-hold on Nielsen and that choke-hold caused Nielsen's death, he is entitled to qualified immunity because it was not clearly established on December 23, 1981 that the use of a choke-hold on a mental health patient was unconstitutional. To support his position, he points out that Youngberg was not decided until 1982 - after he used the choke-hold.
 
 
 18
 Clayton is correct that "in determining whether an officer is entitled to qualified immunity, the plaintiff must point to 'closely analogous cases' decided prior to the defendants' challenged actions." Upton v. Thompson, 930 F.2d 1209, 1212 (7th Cir. 1991). Clayton is also correct that the Supreme Court did not decide Youngberg until after he had used the choke-hold on Nielsen. But even before the Youngberg decision, it was clear that a patient at a state mental hospital was entitled to constitutional protection of life and liberty. Specifically, this circuit held in Spence v. Staras, 507 F.2d 554, 557 (7th Cir. 1974), that an inmate at a state mental hospital "had a right, under the Fourteenth Amendment, to be secure in his life and person while confined under state authority." Other circuits had also reached this conclusion prior to 1981. Goodman v. Parwatikar, 570 F.2d 801, 804 (8th Cir. 1978) (holding that a mentally retarded patient "had a constitutional right to a basically safe and humane living environment"); Romeo v. Youngberg, 644 F.2d 147, 162 (3d Cir. 1980), vacated by Youngberg, 457 U.S. 307 (holding that the Fourteenth Amendment's prohibition of state deprivation of life and liberty without due process applied to involuntarily confined patient of a mental hospital). Thus, while the Supreme Court had not yet specifically held that a patient in a mental hospital was entitled to constitutional protection of life and liberty, it was nonetheless clearly established in the lower courts. Donovan v. City of Milwaukee, 17 F.3d 944, 952 (7th Cir. 1994) (noting that in ascertaining whether a particular right has been clearly established, this court does not require binding precedent from the Supreme Court).
 
 
 19
 The Tenth Circuit reached the same conclusion in Garrett v. Rader, 831 F.2d 202, 203 (10th Cir. 1987). In Garrett, Eva Garrett sued the superintendent of a state institution for retarded children where her daughter died. In her complaint, Garrett alleged that the institution violated her daughter's constitutional rights to life and liberty by unreasonably restraining her daughter and causing her death. The superintendent moved for summary judgment on the basis of qualified immunity, claiming that the due process rights of inmates in a state mental institution were not established until the decision of the Supreme Court in Youngberg. The district court denied the motion for summary judgment and the Tenth Circuit affirmed. In doing so, the Tenth Circuit held that while Youngberg was not decided until after the daughter's death, the due process rights of patients at a state mental institution were entitled to protection long before 1980. Id. at 203. In fact, as the Tenth Circuit noted, the Youngberg decision recognized this point by stating that, "[i]n the past, this Court has noted that the right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause."' Id. at 204.[3] It is therefore clear that at the time that Clayton used the choke-hold, Nielsen, as an involuntarily committed patient of a mental hospital, was entitled to constitutional protection for life and liberty. Spence, 507 F.2d at 557; Garrett, 831 F.2d at 203.
 
 
 20
 In response, Clayton argues that while this general principle may have been clearly established at the time that he used a choke-hold on Nielsen, he is nonetheless entitled to qualified immunity because no court has specifically held that the use of a choke-hold violates the general right to life and liberty. For a constitutional right to be clearly established, however, the specific act need not have been previously held unlawful if the illegality of the act should be apparent in light of pre-existing law. Anderson v. Creighton, 483 U.S. 635, 640 (1987). This court aptly explained this point in K.H. Through Murphy v. Morgan, 914 F.2d 846, 851 (7th Cir. 1990), stating:
 
 
 21
 It begins to seem as if to survive a motion to dismiss a suit on grounds of immunity the plaintiff must be able to point to a previous case that differs only trivially from his case. But this cannot be right. The easiest cases don't even arise. There has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages liability because no previous case had found liability in these circumstances.
 
 
 22
 Such is the case here. The evidence, viewed in the light most favorable to the plaintiff, established that Nielsen was peacefully sleeping, albeit in the middle of a hallway, when Clayton woke him up, grabbed him in a choke-hold and dragged him to an observation room. At oral argument, Clayton's attorney admitted that it would be a constitutional violation to drag Nielsen by the hair to the observation room. Yet that situation, while creating a distasteful image, is not nearly as dangerous as dragging a patient by the neck in a choke-hold.[4] And at the time that Clayton used the choke-hold, it was clearly established that a choke-hold is a life-threatening procedure, see, e.g., Williams v. Kelley, 624 F.2d 695 (5th Cir. 1980) (dragging prisoner in a choke-hold caused prisoner's death within ten feet), and one appropriate only in defensive situations. Id. Accordingly, it should have been clear that the use of a choke-hold to move a non-violent, cooperative patient from one area of a hospital to another deprives the patient of his right to be secure in his life and liberty. We, therefore, conclude that Clayton was not entitled to qualified immunity.
 
 
 23
 Next, Clayton, joined by defendants Barnes and Honeysucker, appeals the district court's denial of their motions for JNOV on the plaintiffs' claim that they conspired to deprive the plaintiffs of their right of access to the courts. As stated above, we review the district court's denial of a motion for judgment as a matter of law de novo, Futrell, 38 F.3d at 346, considering "whether the evidence presented, combined with all reasonable inferences that may be drawn from it, sufficiently supports the jury verdict when viewed in the light most favorable to the party winning the verdict." Id.
 
 
 24
 The right of access to the courts finds a constitutional basis in the due process clause, which "assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights." Wolff v. McDonnell, 418 U.S. 539, 579 (1974). Conspiring to cover up and conceal facts is actionable under Section 1983 as a violation of the right of access to the court. Bell v. City of Milwaukee, 746 F.2d 1205, 1260 (7th Cir. 1984).
 
 
 25
 In this case, the jury found that Clayton, Honeysucker, and Barnes conspired to cover up the facts surrounding Nielsen's death. Clayton, Honeysucker and Barnes do not challenge the sufficiency of the evidence on this point. Rather they claim that the evidence was insufficient to show that the plaintiffs were damaged by this conspiracy. We disagree. The evidence presented at trial established that the plaintiffs suffered great emotional distress as a result of the conspiracy to cover up the cause of Nielsen's death. And a plaintiff may recover damages "for, among other injuries, emotional distress resulting from a deprivation" of constitutional rights, including the right of access to courts. Bell, 746 F.2d at 1265.
 
 
 26
 In response, defendants claim that even if the evidence was sufficient to prove emotional distress, the plaintiffs were only entitled to recover for the emotional distress suffered from the time of Nielsen's death until they filed suit in the district court, since at this time the plaintiffs had successfully accessed the courts. The violation of the right of access to courts, however, need not necessarily entail or result in the denial of a party's right to pursue a claim in court. Bell, 746 F.2d at 1265. Rather, it can be the denial of "adequate, effective, and meaningful" access to the courts. Ryland, 708 F.2d at 972 (citing Bounds v. Smith, 430 U.S. 817 (1977)). Where a cover-up of a constitutional deprivation continues during trial, plaintiffs are being denied adequate, effective and meaningful access to the courts. Bell, 746 F.2d at 1265. Thus, plaintiffs were entitled to recover for emotional distress suffered until they obtained relief for Nielsen's death, which was when the jury returned a verdict in their favor. Bell, 746 F.2d at 1265 (noting that a damage award for a conspiracy to deprive plaintiffs access to courts may include damages suffered until plaintiffs are able to obtain recovery).
 
 
 27
 We turn to the plaintiffs' cross-appeal. Plaintiffs appeal the district court's grant of JNOV to defendants Basit and Choi on their claim that these defendants conspired with defendants Clayton, Barnes and Honeysucker to cover up the cause of Nielsen's death and thereby deprive plaintiffs of their right of access to the courts. After reviewing the evidence in the light most favorable to the plaintiffs, we agree with the district court that no reasonable jury could conclude that Basit and Choi had joined the conspiracy to cover up the cause of Nielsen's death.
 
 
 28
 First, as to Choi, the evidence merely established that Choi was the doctor who pronounced Nielsen dead on the morning of December 24. Plaintiffs respond by pointing to evidence that Choi failed to report to the police that there was blood on Nielsen's nostrils and sheets. Plaintiffs infer from this evidence that Choi sought to conceal the cause of Nielsen's death. The existence of blood on Nielsen's nostrils and sheets, however, was readily noticed by the police. Thus, Choi's failure to inform them of the obvious cannot create a reasonable inference that he sought to conceal this fact from them. Plaintiffs also assert that Choi's intent to join the conspiracy is evidenced by the fact that following Nielsen's death he told the police that Nielsen appeared to have died from cardiac arrest. But this was only a preliminary diagnosis. It cannot create a reasonable inference that Choi sought to cover up the cause of Nielsen's death.
 
 
 29
 The evidence of Basit's involvement in the circumstances surrounding Nielsen's death is also insufficient to support a finding that Basit conspired with Clayton, Barnes or Honeysucker to cover up the cause of Nielsen's death. All of the evidence cited by plaintiffs in support of their claim that Basit joined the conspiracy concerned Basit's involvement with the committee that he had empaneled to investigate Nielsen's death. But Basit's work with the committee does not create an inference of agreement with Clayton, Barnes and Honeysucker (who were not members of the committee) to cover up the cause of Nielsen's death. There is simply no evidence linking Basit to the conspiracy.
 
 
 30
 Next, the plaintiffs contend that the district court erred in requiring plaintiffs to accept a remittitur or undergo a new trial on the issue of damages. Admittedly, the plaintiffs were given a difficult decision to make after having waited ten years to have their rights vindicated. The plaintiffs nevertheless accepted the remittitur of the damage award from $2,745,492 to $1,194,492. They therefore cannot appeal the propriety of the remittitur order. Donovan v. Penn Shipping Co., Inc., 429 U.S. 648, 649 (1977).
 
 III. Conclusion
 
 31
 The evidence was sufficient to support a jury verdict that Clayton had deprived Nielsen of his constitutional right to life and liberty, and Clayton was not qualifiedly immune from suit. The evidence was also sufficient to support a jury verdict that Clayton, Barnes and Honeysucker had conspired to deprive plaintiffs of their right of access to courts by covering up the cause of Nielsen's death. The evidence, however, was insufficient to support a finding that Basit and Choi had joined this conspiracy. Accordingly, the district court properly granted Basit and Choi JNOV and properly denied Clayton, Honeysucker and Barnes JNOV. Finally, since plaintiffs accepted the remittitur they therefore cannot appeal the propriety of that order. For these and the foregoing reasons, we AFFIRM.
 
 
 
 [1]
 The complaint also alleged a claim against Hattie Stringfellow, another Tinley Park nurse. This claim was dismissed before trial and is not an issue on appeal
 
 
 [2]
 Plaintiffs' complaint also alleged a claim against Superintendent Basit asserting that he failed to adequately train, discipline and supervise Tinley Park employees. The district court dismissed this claim and plaintiffs do not appeal the dismissal
 
 
 [3]
 The Sixth Circuit in Davis v. Holly, 835 F.2d 1175 (6th Cir. 1987), appeared to reach a contrary conclusion, finding that the failure to prevent a rape and the failure to prevent self-injury at a state mental institution did not violate clearly established constitutional rights prior to Youngberg. In doing so, however, the Sixth Circuit did not hold that prior to Youngberg mental patients did not have constitutional rights to life and liberty. Rather, the Sixth Circuit concluded that, prior to Youngberg, negligence was not a basis to support such a constitutional claim. The Davis court, however, recognized that prior to Youngberg other circuits, including the Seventh, held that a mental patient had the right to be secure in his life and person while confined under state authority. Id. at 1180. In fact, Davis cited the Seventh Circuit case of Spence v. Staras, 507 F.2d at 557, establishing this principle
 
 
 [4]
 When Gallardo testified, he identified a picture demonstrating a choke-hold which was similar to the choke-hold he claims Clayton used. Clayton does not deny knowledge of what a choke-hold is or the danger of using it