Carl S. GIBSON

v.

The CITY OF CLARKSVILLE,
TENNESSEE, et al.

No. 3:92–0051.

United States District Court,
M.D. Tennessee,
Nashville Division.

Oct. 4, 1993.

Joseph Howell Johnston, Nashville, TN, for plaintiff.

William Timothy Harvey, Landon W. Meadow, Daniel, Harvill, Batson & Nolan, Clarksville, TN, for defendant City of Clarksville.

William Bryan Jakes, III, Darrell Gene Townsend, Howell, Fisher & Branham, Nashville, TN, for defendant Joe Papastathis.

William Timothy Harvey, Daniel, Harvill, Batson & Nolan, Clarksville, TN, for defendants Jerry Gibbs, J. Runyon, C. Abernathy, F. Gray and Bill Carney.

## MEMORANDUM

HIGGINS, District Judge.

The plaintiff, Carl S. Gibson, filed this action for damages under 42 U.S.C. § 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343(a)(3) against the defendants: City of Clarksville, Tennessee, and city police officers Joe Papastathis, Jay Runyon, Charles Abernathy, Frank Gray, Jerry Gibbs[1] and Bill Carney. Gibson's claims are for violations of his Fourth and Fourteenth Amendment rights[2] against unreasonable seizures and excessive use of force arising out of his arrest for burglary on January 14, 1991, in Clarksville. The defendant, Papastathis, allegedly permitted his police dog to bite Gibson without justification and to excess. The defendants, Carney, Gray, Runyon and Abernathy, allegedly failed to protect him and allowed the police dog to continue to bite Gibson after he had been handcuffed. The defendant City allegedly authorized and acquiesced in Papastathis' use of excessive force with his police dog by the City's failure to provide adequate training, supervision or review of Papastathis' conduct by his supervisors.

Pending before the Court is the defendants' motion for summary judgment (Docket Entry No. 26), in which they argue that (1) the facts are insufficient to show any custom or policy by the City that caused Gibson's injury so as to impose § 1983 liability on the City; (2) the facts reflect only proper use of force because Gibson was committing a felony and did not cooperate after prior warning and, in fact, resisted the officers who attempted to arrest him; (3) to the extent any § 1983 excessive force claim is stated, the qualified immunity doctrine bars monetary

1. Gibson has dismissed his claim against Gibbs with prejudice. (Docket Entry Nos. 32 and 33).

2. By previous order, plaintiff's pendent state law claim against the City was dismissed without prejudice. (Docket Entry Nos. 13, 14 and 20).

relief against the defendant officers; (4) Gibson's allegations that defendants Abernathy and Carney failed to report this incident do not state a § 1983 claim, and if they do, then the qualified immunity doctrine bars any award of damages on that claim; (5) Gibson's allegation that defendant Abernathy failed to prevent his injuries does not state a § 1983 claim, and if it does, the qualified immunity doctrine bars an award of damages claim; and (6) Gibson's allegation that defendants Runyon and Gray were guilty of reckless conduct in their arrest of him is insufficient to state a claim upon which the plaintiff can recover.

For the reasons set forth below, the Court denies the defendants' motion for summary judgment except as to the lack of training and Fourteenth Amendment claims. First, under the applicable law, Gibson's excessive use of force claims are evaluated only under the Fourth Amendment. Second, given the seriousness of Gibson's multiple injuries that required two surgical procedures, material factual disputes exist as to the reasonableness of the defendant officers' use of force. In particular, there are factual disputes as to Gibson's conduct at the time of his arrest, Papastathis' use of the police dog and the acts of the other defendant officers in effecting his arrest by allowing the police dog to continue to bite Gibson after he was handcuffed. As to the City, it designated its police chief to monitor the use of police dogs, and to evaluate Papastathis' use of his dog in arresting Gibson. The police chief's decision that the police officers acted properly was a decision of the City. In addition, there is evidence of ten people having been bitten by Papastathis' dog to the extent that they also required medical treatment, including admission to hospitals. The City had been warned earlier by another police officer that Papas-

tathis would not control his dog. These facts are sufficient to create material factual disputes to impose § 1983 liability against the City in its supervision of its police officers.

### I.[3]

Around 10:00 p.m., on January 14, 1991, Gibson and his brother raised an open window of a church and entered the premises. According to Gibson, he and his brother entered the church to get something to eat. Later, Gibson pleaded guilty to burglary of the church. Within ten to fifteen minutes after entering the church, Gibson became aware of the police outside the church and went to the upper part of the church to avoid them.

Gibson then left that area of the church and went to a porch roof on the front of the church. There, Gibson broke the window to get out on the porch roof on the side of the church where he lay down on his back. Gray states that warnings were given that the K–9 would be released into the church if Gibson did not surrender. Gibson, who has a hearing impairment from his prior military service, was first unaware of a police dog until the dog followed him through a broken second story window onto the porch roof. The dog first bit Gibson on his left hip. According to Gibson, he was standing when the K–9 first bit him. Gibson was unarmed at the time of his apprehension. Gibson's brother, who was also on the roof, surrendered without incident.

According to Gibson, when Papastathis arrived at the roof site,[4] he handcuffed Gibson from the back, and once Gibson was handcuffed, Papastathis struck him a few times on the back of his head with a stick and let the dog bite him again. The dog bit Gibson

---

**3.** Upon a motion for summary judgment the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. *Duchon v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir.1986) *app.* 840 F.2d 16 (6th Cir.1988) (unpublished opinion). As will be discussed *infra*, under recent Supreme Court holdings, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for a directed verdict, *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–52, 106 S.Ct. 2505, 2509–12,

91 L.Ed.2d 202 (1986), particularly where there has been an opportunity for discovery. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 276 (1986). Because there are material factual disputes, this section does not represent findings of fact within the meaning of Fed.R.Civ.P. 56(d).

**4.** This roof size is estimated at "15 to 25 feet wide." (Docket Entry No. 37, Exhibit VII thereto, Gibbs deposition at 31.)

repeatedly on his right calf. Runyon claims that he, Frank Gray and Charles Abernathy did not have a clear view of what was occurring on the roof.

According to Gibson, two other officers whom he cannot identify, arrived at the window to the porch roof and immediately grabbed Gibson by his shoulders and pulled him through the broken window. Gibson wanted to be pulled through the window. Throughout this time, the dog continued to bite and cling to Gibson, who was not resisting. Gibson told the officers that the dog was chewing on his leg as they were pulling him through the window, and the officers could see the dog at the time they pulled the plaintiff through the window. Gibson was taken by ambulance to the hospital for treatment.

Gibson suffered multiple injuries to his right lower leg that required extensive medical treatment, including two surgical procedures. Gibson underwent skin graft surgery on his right leg to repair the severe muscle damage caused by the dog bite.

According to Carney, a lieutenant who was the senior officer at the scene, when Papastathis "secured" Gibson, he summoned the other defendants. Defendants Carney, Gray, Runyon and Abernathy entered the porch area and broke out the remaining glass from the second window before pulling Gibson through the window with the dog still chewing on Gibson's right lower leg. During a three-and-a-half year period prior to Gibson's arrest in 1991, Papastathis had been involved in ten incidents that resulted in people being injured by his dog and requiring medical treatment. Four of these people, James Bonter, Frank Mosley, James Milton Pettus and Bruce Gordon Miles, required treatment as in-patients at a hospital facility. Four other people received medical treatment at the hospital, but were released on an outpatient basis.

The City's final policymaking authority is the city council. The City Code requires that its officers be adequately trained. The policies and procedures of the Clarksville police department are drafted by the chief of police, but the city council must decide to accept or reject them. The chief of police, however, under the city charter and under the Policy and Procedure Manual, in effect in 1991, has the authority to issue orders to amend the policy manual on an interim basis through special orders and directives. The City requires the chief of police to investigate any incident where a police officer is suspected of misconduct and report the same to the city council. City officers who are guilty of misconduct are subject to disciplinary action by the city council.

Rosson, the City's chief of police since July, 1989, served as deputy chief of police in charge of operations from July, 1987, to July, 1989. As chief of police, Rosson has primary responsibility for internal affairs investigations for the police department. The chief of police, under the Policy and Procedure Manual in effect in 1991, has the authority to issue orders to amend the policy manual on an interim basis through special orders and directives.

In 1991, General Order No. 9 was issued, requiring photographs to be taken of dog bite injuries of criminal suspects to document the injuries. These photographs are not usually filed with the "use of force" forms because color film sometimes takes weeks to develop.

In the police department, the chief of police and the deputy chief of police have only initiated an investigation of an injury caused by a police dog when a lawsuit or administrative complaint has been filed. Rosson reviews a "use of force" form to see if there is an injury that suggests excessive force. Rosson also asks the supervisor if everything is proper and, absent a supervisor's statement of a potential problem, Rosson takes no other action. According to Rosson, if he were aware of an incident regarding excessive force, he would probably order an Internal Affairs investigation, after initially requesting additional information, such as the interview of witnesses. Nothing in the police department Policy and Procedures Manual in effect in 1991 requires officers to describe the extent of injuries to a person who has been arrested. There is no routine investigation or briefing with officers or with city

administrators with regard to injuries due to use of a police dog.

Rosson assumes that some type of personal injury will result when a police dog is involved in apprehending a suspect; therefore, he does not always request photographs of the suspect's injuries. Rosson has had no training on the type of injury that should be expected for suspects who are apprehended by a police dog. Rosson claims that he understands what is expected from a K–9 apprehension and, therefore, the mere fact that a criminal suspect is hospitalized for his injuries does not require an inquiry. Nonetheless, Rosson admits that he has never asked for a statement from a person injured by a K–9 on how his injury occurred.

With respect to Gibson, after the city council was notified of complaints concerning the amount of force used by officer Papastathis, it checked with the chief of police who again reviewed the incident and informed the city that officer Papastathis' conduct had been proper. Rosson reviewed the "use of force" form, the arrest report and supplemental reports, but did not investigate Gibson's injuries. Papastathis was not requested, either verbally or in writing, to provide any additional information on Gibson's injuries to superior officers.

Gibson also submitted proof from James J. Fyfe, an expert witness who has testified in federal court as an expert on police practices. In Fyfe's opinion, the force used by the defendants was unnecessary and unreasonable under the facts and circumstances of Gibson's arrest. In addition, Fyfe states that the City's policies and practices are inadequate to supervise the police officers who use police dogs, and such lack of supervision caused Gibson's injuries. Fyfe also refers to a letter from a police officer from Nashville to City officials that from his observations, Papastathis allowed the dog to bite a person repeatedly and did not control his dog.

## II.

The very reason of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial. Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so long as the opposing party was on notice that she had to come forward with all of her evidence." *Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265, 276 (1986). *Accord, Routman v. Automatic Data Processing, Inc.*, 873 F.2d 970, 971 (6th Cir.1989).

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.
>
> *As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.* Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247–48, 106 S.Ct. at 2509–10, 91 L.Ed.2d at 211 (emphasis in the original and added in part). Earlier, the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electrical Industrial Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986) (citations omitted).

A motion for summary judgment is to be considered "after adequate time for discovery." *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2552, 91 L.Ed.2d at 273 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. *Emmons v. McLaughlin*, 874 F.2d 351, 355–57 (6th Cir. 1989). *But see Routman v. Automatic Data Processing, Inc.*, 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties.

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.... [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim.

*Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553, 91 L.Ed.2d at 274 (emphasis added).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." *Martin v. Kelley*, 803 F.2d 236, 239 n. 4 (6th Cir.1986). The moving party's burden is to show " 'clearly and convincingly' the absence of any genuine issues of material fact." *Sims v. Memphis Processors, Inc.*, 926 F.2d 524, 526 (6th Cir. 1991). "So long as the movant has met its initial burden of 'demonstrat[ing] the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth the specific facts showing that there is a genuine issue for trial.' " *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir.1989) (quoting *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553, 91 L.Ed.2d at 274 and Fed.R.Civ.P. 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must address more than a scintilla of evidence to overcome the motions [and] ... must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.' " *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989) (quoting *Liberty lobby*, 477 U.S. at 257, 106 S.Ct. at 2514, 91 L.Ed.2d at 217). Moreover, the Court of Appeals explained that

> The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

*Street*, 886 F.2d at 1480. See also *Hutt v. Gibson Fiber Glass Products*, 914 F.2d 790 (6th Cir.1990) (A court deciding a motion for summary judgment must determine "whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.") (quoting *Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. at 2512, 91 L.Ed.2d at 214.)

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, *summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.*
>
> ....
>
> Progressing to the specific issue in this case, we are convinced that *the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits.* If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, *the judge must ask himself not whether he thinks the evidence*

*unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff of the evidence presented.* The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. *The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict— "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."*

*Liberty Lobby,* 477 U.S. at 251–52, 106 S.Ct. at 2510, 2512, 91 L.Ed.2d at 211–212, 214 (citation omitted and emphasis added).

It is likewise true that

[i]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated.

It has been stated that: "The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute ..."

*Bohn Aluminum & Brass Corp. v. Storm King Corp.,* 303 F.2d 425, 427 (6th Cir.1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." *Duchon v. Cajon Company,* 791 F.2d 43, 46 (6th Cir.1986) (unpublished opinion) (citation omitted).

In a recent decision, the Court of Appeals further explained the district court's role in evaluating the proof on a summary judgment motion:

A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by

the nonmoving party sufficient to establish a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." *Webster's Third New International Dictionary* (1986).

Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

*InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), *cert. denied, Superior Roll Forming Co. v. InterRoyal Corp.,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). Here, the parties have given some references to the proof upon which they rely. Local Rule 8(b)(7)(a) and (c) require a showing of undisputed and disputed facts.

### III.

First, as to the City, unlike states, cities are persons who may be liable under § 1983 for their illegal acts or those of their employees, but only under certain conditions, where:

[the employee's] action ... implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers[;] [There is] official municipal policy of some nature[; or]

[The] execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy....

*Monell v. Department of Social Services,* 436 U.S. 658, 690, 691, 694, 98 S.Ct. 2018, 2035–36, 2037–38, 56 L.Ed.2d 611, 635, 636, 638 (1978).

"[T]he *Monell* Court held that only deprivations visited pursuant to municipal 'custom' or 'policy' could lead to municipal liability" under Section 1983. *Oklahoma City v.*

*Tuttle,* 471 U.S. 808, 818, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791, 801 (1985). As to the quantum of proof required to establish liability of local governmental units under *Monell,* the plurality opinion of four Justices in *Tuttle* stated:

> Proof. of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved. But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the "policy" and the constitutional deprivation.

*Tuttle,* 471 U.S. at 823–24, 105 S.Ct. at 2436, 85 L.Ed.2d at 804 (footnotes omitted).

Later, however, in *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the Supreme Court, in another plurality opinion, held that the single decision of an authorized municipal decisionmaker, the district attorney, may be considered to set municipal policy and thereby be the basis of municipal liability under § 1983.

> If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government "policy" as that term is commonly understood. *More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly.* To deny compensation to the victim would therefore be contrary to the fundamental purpose of § 1983.

*Id.* at 481, 106 S.Ct. at 1298–99, 89 L.Ed.2d at 463–64 (emphasis added) (footnote omitted).

In a third plurality opinion it was stated that whether a single official has policymaking authority for a municipality is a question of state law for the court. *City of St. Louis*

*v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). As to the factors to consider, if state law is unclear, the plurality opinion in *Praprotnik* states:

> When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

*Id.* at 127, 108 S.Ct. at 926, 99 L.Ed.2d at 120. *Accord Johnson v. Hardin County,* 908 F.2d 1280 (6th Cir.1990) (when state law indicates county fiscal court sets jail policy, jailer is not final policymaker for county).

■ Here, the City is a named defendant. While the city council is the final policymaker for the City, the council has authorized Rosson, its chief of police to be the official who has "general control and supervision" of all Clarksville police officers. If Rosson were directed by the council to decide whether the officers acted properly in arresting Gibson, and Rosson decided the arrest was proper, the City took no further action. Therefore, although the council decides disciplinary sanctions against police officers, Rosson's decision on a non-disciplinary action is dispositive on behalf of the council. The Court concludes that, as the City's decisionmaker on these matters, the chief's actions and inactions can impose § 1983 liability upon the City.

■ This conclusion is consistent with the § 1983 decisional law. A city is liable in § 1983 actions brought against its police chief in his official capacity when the City has notice of the action.

> In at least three recent cases arising under § 1983, we have plainly implied that a judgment against a public servant "in his official capacity" imposes liability on the entity that he represents provided, of

course, the public entity received notice and an opportunity to respond. We now make that point explicit.

*Brandon v. Holt,* 469 U.S. 464, 471–72, 105 S.Ct. 873, 878, 83 L.Ed.2d 878, 885 (1985).

In *Marchese v. Lucas,* 758 F.2d 181 (6th Cir.1985), the Court of Appeals further elaborated this rule.

We believe that the relationship between the County and the Sheriff's Department is so close as to make the County liable for the Sheriff's failure to train and discipline his officers and his ratification of the use of wanton brutality by members of his force which we have spelled out above. Obviously this holding is consistent with and indeed compelled by the U.S. Supreme Court's decision in *Brandon v. Holt, supra.*

*Id.* at 189.

Applying *Marchese,* the Court concludes that the relationship between the City and its police chief is so close so as to render the City liable under § 1983 for the chief's acts.

■ Municipal liability also can rest upon proof of prior excessive use of force by a police officer which should have provided notice to the municipality and its key officials about his conduct. *Brandon,* 469 U.S. at 466–67, 105 S.Ct. at 875, 83 L.Ed.2d at 882; *Leach v. Shelby County Sheriff,* 891 F.2d 1241 (6th Cir.1989), *cert. denied,* 495 U.S. 932, 110 S.Ct. 2173, 109 L.Ed.2d 502 (1990). In *Brandon,* municipal liability was imposed where a police officer involved in an excessive use of force claim had twenty citizen complaints (not civil actions) of abusive conduct lodged against him. 469 U.S. at 466–67, 105 S.Ct. at 875, 83 L.Ed.2d at 882. In *Leach,* the Court of Appeals affirmed municipal liability for the sheriff's failure to attend to the medical needs of at least fourteen paraplegic inmates because "the need for more adequate supervision was so obvious and the likelihood that the inadequacy would result in the violation of constitutional rights was so great that the County as an entity can be held liable here for the extent of [plaintiff's] determined damages." 891 F.2d at

1248. In *Leach,* there was also evidence of municipal ratification of the sheriff's "deliberate indifference" in his "failure to supervise and correct the situation in view of the numerous similar incidents and his failure subsequently to punish the responsible individuals...." *Id.* In an official capacity action, a supervisor cannot rely upon ignorance of unconstitutional acts, because he "has a duty to both know and act." *Marchese,* 758 F.2d at 188.

■ As these principles are applied here, Gibson has tendered proof that prior to his arrest, Papastathis was involved in ten incidents in which his police dog bit people so extensively as to require medical attention, including hospitalization for four of them.[5] Further, a Nashville police officer told City police officials that Papastathis did not control his dog in making an arrest. The evidence is that these incidents occurred before Gibson's injury. Moreover, the evidence, including the affidavit of Gibson's expert witness, when viewed in a light most favorable to Gibson, reflects that Rosson, as the City police chief, did not adequately supervise or investigate any of these incidents and that such inadequate practices caused Gibson's injuries. Under *Holt,* the Court concludes that this evidence could sustain a § 1983 claim against the City with the exception of inadequate training.

For claims against a municipality for inadequate training, there are specific evidentiary burdens to satisfy in order to impose § 1983 liability. In *City of Canton, Ohio v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Court addressed the requisite proof for a § 1983 claim against a municipality for physical injuries allegedly caused by inadequate training of its police officers.

[The] first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation....

. . . .

---

**5.** In the Court's view, these pre-Gibson incidents render this action factually distinguishable from *Mosley v. City of Clarksville,* No. 3:90–0336

(M.D.Tenn. memorandum and order entered December 22, 1992; Docket Entry Nos. 106–107; J. Echols).

... We reject petitioner's contention that only unconstitutional policies are actionable under the statute.

... We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact....

... [A] municipality can be liable under § 1983 only where its policies are the "moving force [behind] the constitutional violation." Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983....

*Monell's* rule that a city is not liable under § 1983 unless a municipal policy causes a constitutional deprivation will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible. That much may be true. The issue in a case like this one, however, is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy." ... But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

... *[T]he focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from fac-*

*tors other than a faulty training program.* It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

*Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury.* Thus in the case at hand, respondent must still prove that the deficiency in training actually caused the police officers' indifference to her medical needs. Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect? ....

*Id.* 489 U.S. at 385, 387–391, 109 S.Ct. at 1203, 1204–1206, 103 L.Ed.2d at 424, 426–28 (emphasis added) (footnotes and citations omitted). *See also, Beddingfield v. City of Pulaski,* 861 F.2d 968, 972 (6th Cir.1988) (city's refusal to send officials to state training institute was not deliberate indifference to training where city provided its own training); *Rymer v. Davis,* 754 F.2d 198, 201 (6th Cir.1985), *vacated, Shepherdsville v. Rymer,* 473 U.S. 901, 105 S.Ct. 3518, 87 L.Ed.2d 646 (1985), *on remand, Rymer v. Davis,* 775 F.2d 756 (6th Cir.1985) (city held to be liable for its "failure to train its police officers and the City's bestowal of carte blanche authority to its police officers" to arrest persons).

■ On his training claim, Gibson does not make a specific showing of how the City's cited program is deficient. While Fyfe's affidavit is highly critical of the City's supervisory policies and practices in these circumstances, Fyfe is silent on the City's training

practices. The facts establish that each of the defendant police officers is trained. Under *Canton,* Gibson's showing is inadequate, and the Court concludes that the City is entitled to judgment on Gibson's training claim.

## IV.

■ As to Gibson's claim of excessive use of force against the defendant officers, the Fourth Amendment applies to excessive use of force claims that involve persons being arrested. In *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the plaintiff, who was not convicted of any criminal charges, filed a § 1983 action to recover damages from law enforcement officers who used physical force against him after an investigatory stop. Initially the Court distinguished use of force claims of citizens versus such claims of convicted prisoners.

This case requires us to decide what constitutional standard governs a free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other "seizure" of his person. We hold that such claims are properly analyzed under the Fourth Amendment's "objective reasonableness" standard, rather than under a substantive due process standard.

. . . .

*We reject this notion that all excessive force claims brought under § 1983 are governed by a single generic standard. . . . In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force. . . . In most instances, that will be either the Fourth Amendment's prohibition against unreasonable seizures of the person, or the Eighth Amendment's ban on cruel and unusual punishments,* which are the two primary sources of constitutional protection against physically abusive governmental conduct. The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right,

rather than to some generalized "excessive force" standard.

. . . .

*. . . Differing standards under the Fourth and Eighth Amendments are hardly surprising: the terms "cruel" and "punishment" clearly suggest some inquiry into subjective state of mind, whereas the term "unreasonable" does not. Moreover, the less protective Eighth Amendment standard applies "only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." The Fourth Amendment inquiry is one of "objective reasonableness" under the circumstances, and subjective concepts like "malice" and "sadism" have no proper place in that inquiry.*

*Graham,* 490 U.S. at 388, 393–94, 398–99, 109 S.Ct. at 1867, 1870–71, 104 L.Ed.2d at 450, 453–54 (emphasis added) (footnote and citation omitted).

For the § 1983 plaintiff who is a "free citizen," the Court applies the Fourth Amendment reasonableness standard.

*Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment* which guarantees citizens the right. . . . Though the complaint alleged violations of both the Fourth Amendment and the Due Process Clause, we analyzed the constitutionality of the challenged application of force solely by reference to the Fourth Amendment's prohibition against unreasonable seizures of the person, *holding that the "reasonableness" of a particular seizure depends not only on when it is made, but also on how it is carried out. Today we . . . hold that all claims that law enforcement officers* have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free *citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. . . .*

*Graham,* 490 U.S. at 394–95, 109 S.Ct. at 1871, 104 L.Ed.2d at 454 (emphasis in origi-

nal and added in part) (citations omitted). *Accord McDowell v. Rogers,* 863 F.2d 1302, 1306 (6th Cir.1988); *Blaska v. Fuentes,* 836 F.2d 1347 (6th Cir.1988) (excessive force in arrest to be analyzed under "reasonableness" standard of Fourth Amendment). Thus, under *Graham,* Gibson's Fourteenth Amendment claim should be dismissed.

As to how the reasonableness standard under the Fourth Amendment is to be applied, the Court listed several factors and considerations.

Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the countervailing governmental interests at stake. Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.... "Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," however, its proper application requires careful attention to the facts and circumstances of each particular case, including the *severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight....*

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested, nor by the mistaken execution of a valid search warrant on the wrong premises. With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

... An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

*Graham,* 490 U.S. at 396–97, 109 S.Ct. at 1871–72, 104 L.Ed.2d at 455–56 (emphasis added) (citations omitted).

In *Patrick v. City of Detroit,* 906 F.2d 1108 (6th Cir.1990), the Court of Appeals further explained as to the analysis of use of force:

The reasonableness standard requires balancing the extent of the intrusion on the fourth amendment interests of the person arrested against the government's interest in effective law enforcement. The correct focus of the fourth amendment question is whether, from the perspective of a reasonable officer, who many times must make split-second decisions, the force used was reasonable under the circumstances. This is a fact-specific inquiry that depends on factors such as the severity of the crime at issue, whether the suspect poses a threat to anyone, and whether the suspect is attempting to escape or is resisting arrest.

*Patrick,* 906 F.2d at 1115 (citation omitted).

As an example of reasonableness, in *Pleasant v. Zamieski,* 895 F.2d 272 (6th Cir.), *cert. denied,* 498 U.S. 851, 111 S.Ct. 144, 112 L.Ed.2d 110 (1990), the Court of Appeals considered a municipal policy which stated that "[n]o amount of force is too great in making an arrest if it is necessary to overcome obstinate *and dangerous* resistance." 895 F.2d at 274 (emphasis in original). The policy also provided that deadly force was "not to be used in misdemeanor cases. [Deadly force could] be used in felony cases where absolutely necessary and set forth in department rules, regulations, order and procedures." *Id.* In *Pleasant,* the arresting officer's failure to reholster his weapon shortly after an arrest at night was deemed not unreasonable. *Id.* at 277.

As to the use of police dogs, in a case arising out of this district, the Court of Appeals in *Robinette v. Barnes*, 854 F.2d 909 (6th Cir.1988) held that the use of trained police dogs to arrest felons was a reasonable use of force in effecting an arrest. In *Robinette*, the Court of Appeals specifically held that the use of a trained police dog does not constitute the use of deadly force, and is not *per se* unreasonable within the meaning of the Fourth Amendment. The Court also stated:

> We also hold that even if we were to conclude that the use of a police dog to apprehend a suspected felon constitutes deadly force, the use of such force to seize Daniel Briggs was not unreasonable under the circumstances. The Court made it clear in *Garner* that the use of deadly force to apprehend a felony suspect is not *per se* an unreasonable seizure under the Constitution. Rather, the Court held that "[t]o determine the constitutionality of a seizure, '[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *[Tennessee v.] Garner*, 471 U.S. [1] at 8, 105 S.Ct. [1694] at 1699. [85 L.Ed.2d 1] (1985) (quoting *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983)). Thus, the Court concluded that '[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.' *Id.* [471 U.S.] at 11, 105 S.Ct. at 1701.

> . . . .

> The facts indicate that Barnes had probable cause to believe that Briggs, a suspected felon hidden inside a darkened building in the middle of the night, threatened his safety and the safety of the other officers present. As the district court succinctly put it,

>> a reasonably competent officer would believe that a nighttime burglary suspect, who, the officers had good reason to believe, knew the building was surround-

ed, who had been warned ... that a dog would be used, and who gave every indication of unwillingness to surrender, posed a threat to the safety of the officers.

> Unlike the situation in *Garner*, this is not a case where a police officer shot a *fleeing* felon, a criminal suspect who, at least in part because of the fact he was fleeing, posed no threat to the officer. Instead, this is a case where an officer was forced to explore an enclosed unfamiliar area in which he knew a man was hiding. Under the totality of the circumstances, Barnes was justified in using whatever force was necessary, even deadly force, to protect himself and the other officers and to apprehend the suspect.

*Id.* at 913, 914 (footnotes omitted).

■ As these principles are applied here, when the evidence is construed in a light most favorable to Gibson, the use of the police dog alone was not unreasonable inasmuch as there was probable cause to believe that a burglary was in progress. The burglary occurred at nighttime, and the burglars had ignored a police warning to surrender. The evidence, however, also is that after Gibson was handcuffed, Papastathis struck him several times with a stick to the head and ordered the dog to bite him again. As to the other individual officers, Runyon and Abernathy, the testimony is that as soon as they arrived at the window where Gibson was being held, both the officers wanted to remove him from the porch roof through the window. Yet, Gibson asserts that these officers did not protect him from continuing to be bitten by the dog. The medical evidence reflects that Gibson had to undergo two surgical procedures due to the dog bites, and the pictures attest to his injuries. There is also expert proof that the conduct of these officers was unreasonable. Under these circumstances, the trier of fact could find this conduct to be unreasonable in violation of Gibson's Fourth Amendment rights.

■ In order to state a claim against the supervisory officers, Lieutenant Carney and Sergeant Gray, there must be some facts to show that such supervisory officers were involved in, and/or had knowledge of, the un-

lawful acts so as to ratify or acquiesce in them. In sum, a prisoner cannot sue a government official for damages solely because of his status as a supervisor. "Section 1983 will not support a claim posed on a respondeat superior theory of liability." *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 453, 70 L.Ed.2d 509, 521 (1981). In *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), the Supreme Court required a direct causal link between the supervisor's exercise of control and the alleged wrongful acts of the defendants.

> The plain words of the [civil rights] statute imposed liability—whether in the form of payment of redressive damages or being placed under an injunction—only for conduct which "subjects, or causes to be subjected" the complainant to a deprivation of a right secured by the Constitution and laws.
>
> ... As the facts developed, there was no affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy by petitioners—express or otherwise—showing their authorization or approval of such misconduct....

*Id.* at 370–71, 96 S.Ct. at 604, 46 L.Ed.2d at 569.

In *Bellamy v. Bradley,* 729 F.2d 416 (6th Cir.1984), *cert. denied,* 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984), the Court of Appeals reiterated:

> Section 1983 liability will not be imposed solely upon the basis of respondeat superior. There must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.

*Id.* at 421. *Accord, Hall v. Shipley,* 932 F.2d 1147 (6th Cir.1991); *Poe v. Haydon,* 853 F.2d 418, 429 (6th Cir.1988), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989); *Davis v. Holly,* 835 F.2d 1175 (6th Cir.1987); *Ghandi v. Police Dept. of City of Detroit,* 747 F.2d 338, 351 (6th Cir.1984); *Hays v. Jeffer-son County,* 668 F.2d 869, 874 (6th Cir.1982) (citation omitted), *reh'g denied,* 673 F.2d 152 (6th Cir.1982), *cert. denied,* 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982).

In *Leach v. Shelby Co. Sheriff,* 891 F.2d 1241 (6th Cir.1989), *cert. denied,* 495 U.S. 932, 110 S.Ct. 2173, 109 L.Ed.2d 502 (1990), the Court ruled that a failure to supervise by implicitly authorizing, approving or knowingly acquiescing in unconstitutional conduct can be the basis of § 1983 liability. 891 F.2d at 1246. In *Leach,* that failure concerned the inadequate care given to paraplegic prisoners. Although there was no direct evidence that the sheriff actually knew of the unconstitutional conduct at issue, the Court of Appeals held that the defendants should have known of the unlawful conduct at issue and remedied it by punishing the responsible officers. The Court also found that past instances of disputed conduct can place the supervisory defendant on notice. 891 F.2d at 1246. *Accord, Brock v. Warren County, Tennessee,* 713 F.Supp. 238, 242–43 (E.D.Tenn.1989) (sheriff assessed $10,000 in punitive damages for failure to correct severely hot temperature after being informed by prisoners).

■ When the supervisor has actual notice of unlawful conduct towards the prisoner, the supervisor may be held liable for failure to protect the prisoner under the theory that the supervisor ratified such unlawful conduct. *Roland v. Johnson,* 856 F.2d 764, 766–67 (6th Cir.1988) (issues of fact about supervisor's prior knowledge of rape danger precludes summary judgment); *McDaniel v. Carroll,* 457 F.2d 968, 969 (6th Cir.1972), *cert. denied,* 409 U.S. 1106, 93 S.Ct. 897, 34 L.Ed.2d 687 (1973) (affirming judgment against sheriff and his surety for deputy sheriff's unjustified shooting).

Non-supervisory law enforcement officials can be liable for the wrongful acts of their fellow officers, and for such liability, the Court of Appeals for the Sixth Circuit has adopted the following standards:

> We believe it is clear that one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who

summarily punish a third person in his presence or otherwise within his knowledge. That responsibility obviously obtains when the nonfeasor is a supervisory officer to whose direction misfeasor officers are committed. So, too, the same responsibility must exist as to non-supervisory officers who are present at the scene of such summary punishment, for to hold otherwise would be to insulate non-supervisory officers from liability for reasonably foreseeable consequences of the neglect of their duty to enforce the laws and preserve the peace. Accordingly, the plaintiff was entitled to have his case against defendants Moran, Pfeiffer and Finnin submitted to the jury upon his having offered testimony that he was beaten by unknown officers in their presence.

*Bruner v. Dunaway,* 684 F.2d 422, 426 (6th Cir.1982), *cert. denied, sub nom., Bates v. Bruner,* 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983) (quoting *Byrd v. Brishke,* 466 F.2d 6, 11 (7th Cir.1972)). *See also Smith v. Heath,* 691 F.2d 220 (6th Cir. 1982).

The Court of Appeals stated earlier in *Smith v. Ross,* 482 F.2d 33 (6th Cir.1973) (*per curiam*):

> We agree with appellants that a law enforcement officer can be liable under § 1983 when by his inaction he fails to perform a statutorily imposed duty to enforce the laws equally and fairly, and thereby denies equal protection to persons legitimately exercising rights guaranteed them under state or federal law. Acts of omission are actionable in this context to the same extent as are acts of commission. . . .

*Smith,* 482 F.2d at 36–37. "As a general rule, mere presence at the scene of a search, without a showing of direct responsibility for the action, will not subject an officer to liability. . . ." *Ghandi v. Police Dep't of City of Detroit,* 747 F.2d 338, 352 (6th Cir.1984). There must be a showing of awareness of the specific incident. *Id.*

The Court finds that the defendants Carney and Gray, who are supervisors, were at the scene of the arrest and were aware of the circumstances of Gibson's arrest and injuries. The defendants Runyon and Abernathy directly were involved and aware of the dog repeatedly biting Gibson after he was handcuffed.

## V.

As to the defendant officers' qualified immunity contentions, the governing principles were summarized in a Section 1983 action against state officials:

> In common with police officers, however, officials with a broad range of duties and authority must often act swiftly and firmly at the risk that action deferred will be futile or constitute virtual abdication of office. Like legislators and judges, these officers are entitled to rely on traditional sources for the factual information on which they decide and act. When a condition of civil disorder in fact exists, there is obvious need for prompt action, and decisions must be made in reliance on factual information supplied by others. While both federal and state laws plainly contemplate the use of force when the necessity arises, the decision to invoke military power has traditionally been viewed with suspicion and skepticism since it often involves the temporary suspension of some of our most cherished rights—government by elected civilian leaders, freedom of expression, of assembly, and of association. Decisions in such situations are more likely than not to arise in an atmosphere of confusion, ambiguity, and swiftly moving events, and when, by the very existence of some degree of civil disorder, there is often no consensus as to the appropriate remedy. In short, since the options which a chief executive and his principal subordinates must consider are far broader and far more subtle than those made by officials with less responsibility, the range of discretion must be comparably broad. . . .
>
> . . . .
>
> These considerations suggest that, in varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at

the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct.

*Scheuer v. Rhodes,* 416 U.S. 232, 246–48, 94 S.Ct. 1683, 1691–92, 40 L.Ed.2d 90, 102–03 (1974) (footnote omitted).

▇ When a defendant raises the issue of qualified immunity, the Court must decide as a preliminary matter, whether the defendants "are being sued for 'discretionary' acts as opposed to 'ministerial' ones. Only officials 'performing discretionary, as opposed to ministerial functions are entitled to qualified immunity from suit.'" *Davis v. Holly,* 835 F.2d 1175, 1178 (6th Cir.1987) (quoting *People of Three Mile Island v. Nuclear Regulatory Commissioners,* 747 F.2d 139, 143 (3d Cir.1984)). Discretionary acts involve "'significant decision-making that entails personal deliberation, decision and judgment.'" *Davis,* 835 F.2d at 1178 (quoting *Ross v. Consumers Power Co.,* 420 Mich. 567, 363 N.W.2d 641, 647 (1984)). By contrast, ministerial acts involve "'the execution of or implementation of a decision and entail only minor decision-making.'" *Davis,* 835 F.2d at 1178. In *Davis,* a mental patient had been raped by staff members at a state psychiatric facility. *See id.* at 1176–77. Plaintiff then based her complaint against various supervisors and officials "primarily upon alleged acts and omissions of the defendants in carrying out their 'responsibility [to provide] proper care and treatment, safe conditions of confinement, and personal security.'" *Id.* at 1179. The Court of Appeals found these "supervisory responsibilities" to be "inherently discretionary in nature." *Id.* These responsibilities were "'almost inevitably ... influenced by the decisionmaker's experiences, values, and emotions,'" *Id.* (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 816, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982)), and thus qualify as 'discretionary.'" *Davis,* 835 F.2d at 1179. The Court concludes that the police officers here exercised discretionary duties in their arrest of Gibson.

As to evaluation of this qualified immunity contention, in *Wood v. Strickland,* 420 U.S. 308, 321–22, 95 S.Ct. 992, 1000–01, 43 L.Ed.2d 214 (1975), the Supreme Court initially set forth a two-part test to determine the availability of this qualified immunity defense. This two-part test was explained later in *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978):

> Under the first part of the *Wood v. Strickland* rule, the immunity defense would be unavailing to petitioners if the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known of that right, and if they knew or should have known that their conduct violated the constitutional norm.
>
> . . . .
>
> Neither should petitioners' immunity defense be overruled under the second branch of the *Wood v. Strickland* standard, which would authorize liability where the official has acted with "malicious intention" to deprive the plaintiff of a constitutional right or to cause him "other injury." This part of the rule speaks of "intentional injury," contemplating that the actor intends the consequences of his conduct. See Restatement (Second) of Torts § 8A (1965).

*Procunier v. Navarette,* 434 U.S. at 562, 566, 98 S.Ct. at 860, 862, 55 L.Ed.2d at 31, 33. *See also, Butz v. Economou,* 438 U.S. 478, 507, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895, 916 (1978) ("officials will not be liable for mere mistakes in judgment whether the mistake is one of law or fact").

▇ Qualified immunity has evolved to mean that the section 1983 plaintiff who seeks damages must show that the legal right was clearly established *at the time of the violation.* *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In addition, the Court of Appeals for the Sixth Circuit adopted the following test to determine whether a right is clearly established: "In order to be clearly established, a question must be decided either by the highest court in the state where the case arose, by a

United States Court of Appeals, or by the Supreme Court." *Robinson v. Bibb,* 840 F.2d 349, 351 (6th Cir.1988) (citation omitted). Later the decisions of the district court also could be included in deciding whether the right at issue was clearly established at the time of the alleged violation.

Our review of the Supreme Court's decisions and of our own precedent leads us to conclude that, in the ordinary instance, *to find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its court of appeals or itself. In an extraordinary case, it may be possible for the decisions of other courts to clearly establish a principle of law.* For the decisions of other courts to provide such "clearly established law," these decisions must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting. Here a mere handful of decisions of other circuits and district courts, which are admittedly novel, can not form the basis for a clearly established right in this circuit.

*Ohio v. Seiter,* 858 F.2d 1171, 1177–78 (6th Cir.1988) (emphasis added). *Accord, Wegener v. Covington,* 933 F.2d 390 (6th Cir.1991) (*per curiam* ). The Court of Appeals in *Eugene D. v. Karman,* 889 F.2d 701 (6th Cir. 1989), *cert. denied,* 496 U.S. 931, 110 S.Ct. 2631, 110 L.Ed.2d 651 (1990), stated that the right "must have been articulated with a significant degree of particularity: ...." 889 F.2d at 706. In other words, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523, 531 (1987)).

In light of *Robinette,* Gibson's Fourth Amendment claim was clearly established at the time of Gibson's arrest in 1991. *Accord, Stickney v. Trikes,* 909 F.2d 1485 (6th Cir. 1990) (clearly established right to be free of excessive force in arrest, and change from

Fourteenth Amendment to Fourth Amendment analysis did not change clearly established law); *Young v. Barrett,* 912 F.2d 466 (6th Cir.1990) (Fourth Amendment clearly established right to be free of excessive force in execution of warrant on January 5, 1988).

## VI.

In sum, the Court concludes that the defendants' motion for summary judgment should be denied except as to Gibson's claim against the City for inadequate training of its police officers and his Fourteenth Amendment claim against all defendants. An appropriate Order is filed herewith.